UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LISA G.,[1]

        Plaintiff,

  v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

---

            6:21-CV-6043-LJV
            DECISION & ORDER

On January 19, 2021, the plaintiff, Lisa G. ("Lisa"), brought this action under the

Social Security Act ("the Act").  She seeks review of the determination by the

Commissioner of Social Security ("Commissioner") that she was not disabled.[2]  Docket

Item 1.  On December 13, 2021, Lisa moved for judgment on the pleadings, Docket

---

   [1] To protect the privacy interests of Social Security litigants while maintaining public access to judicial records, this Court will identify any non-government party in cases filed under 42 U.S.C. § 405(g) only by first name and last initial.  Standing Order, Identification of Non-Government Parties in Social Security Opinions (W.D.N.Y. Nov. 18, 2020).

   [2] Lisa applied for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  One category of persons eligible for DIB includes any adult with a disability who, based on her quarters of qualifying work, meets the Act's insured-status requirements.  See 42 U.S.C. § 423(c); Arnone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989).  SSI, on the other hand, is paid to a person with a disability who also demonstrates financial need.  42 U.S.C. § 1382(a).  A qualified individual may receive both DIB and SSI, and the Social Security Administration uses the same five-step evaluation process to determine eligibility for both programs.  See 20 C.F.R. §§ 404.1520(a)(4) (concerning DIB), 416.920(a)(4) (concerning SSI).

Item 8; on May 3, 2022, the Commissioner responded and cross-moved for judgment

on the pleadings, Docket Item 10; and on June 14, 2022, Lisa replied, Docket Item 12.

For the reasons that follow, this Court grants Lisa's motion in part and denies the

Commissioner's cross-motion.[3]

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of

inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The court "must first

decide whether [the Commissioner] applied the correct legal principles in making the

determination." *Id*.  This includes ensuring "that the claimant has had a full hearing

under the . . . regulations and in accordance with the beneficent purposes of the Social

Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations omitted)

(quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  Then, the court "decide[s]

whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at

985 (quoting 42 U.S.C. § 405(g)).

"Substantial evidence" means "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison

Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "The substantial evidence standard means

once an ALJ finds facts, [the court] can reject those facts only if a reasonable fact finder

would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443,

---

[3] This Court assumes familiarity with the underlying facts, the procedural history, and the decision of the Administrative Law Judge ("ALJ") and refers only to the facts necessary to explain its decision.

448 (2d Cir. 2012) (internal quotation marks and citation omitted) (emphasis in original);
*see McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to
more than one rational interpretation, the Commissioner's conclusion must be upheld.").
But "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal
principles, application of the substantial evidence standard to uphold a finding of no
disability creates an unacceptable risk that a claimant will be deprived of the right to
have her disability determination made according to the correct legal principles."
*Johnson*, 817 F.2d at 986.

## DISCUSSION

### I.     ALJ'S DECISION

On February 26, 2020, the ALJ found that Lisa had not been under a disability
between her alleged disability onset date, February 24, 2018, and the date of the
decision.  *See* Docket Item 7 at 20-30.  The ALJ's decision was based on the five-step
sequential evaluation process under 20 C.F.R. §§ 404.1520(a) and 416.920(a).  *See id.*

At step one, the ALJ found that Lisa met the insured status requirements of the
Act through December 31, 2019, and had not engaged in substantial gainful activity
since her alleged disability onset date.  *Id.* at 23.  At step two, the ALJ found that Lisa
suffered from two severe, medically determinable impairments: fibromyalgia and
systemic lupus erythematosus.  *Id.*

At step three, the ALJ found that Lisa's severe, medically determinable
impairments did not meet or medically equal the severity of one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See id.* at 23-24.  More

specifically, the ALJ found that Lisa's physical impairments did not meet or medically

equal listing 14.02 (systemic lupus erythematosus). *Id.* at 23.

The ALJ then found that Lisa had the residual functional capacity ("RFC")[4] to

perform "sedentary work" as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with

the following additional limitations:

> [Lisa] requires a sit/stand option as follows: sit for 30 minutes, alternate to [a] standing position for 5 minutes, then resume sitting. She should never climb ladders, ropes, or scaffolds.  She is limited to occasionally climb[ing] stairs and ramps, balanc[ing], stoop[ing], and crouch[ing].  [Lisa] should never kneel or crawl.  She should avoid overhead reaching.  She is limited to frequently handl[ing] and finger[ing].   She should avoid working in exposure to cold or atmospheric wetness.

*Id.* at 24.

At step four, the ALJ found that Lisa was unable to perform past relevant work as

a nanny or a licensed practical nurse.  *Id.* at 28; *see Dictionary of Occupational Titles*

301.677-010, 1991 WL 672652 (Jan. 1, 2016); *id.* at 079.374-014, 1991 WL 646863.

But given Lisa's age, education, work experience, and RFC, the ALJ found at step five

that Lisa could perform substantial gainful activity as a call-out operator, tube station

attendant, or document scanner.  Docket Item 7 at 29-30; *see Dictionary of*

*Occupational Titles* 237.367-014, 1991 WL 672186; *id.* at 239.687-014, 1991 WL

672235; *id.* at 249.587-018, 1991 WL 672349.  Therefore, the ALJ found that Lisa was

not entitled to DIB or SSI.  Docket Item 7 at 30.

---

[4] A claimant's RFC is the most she "can still do despite [her] limitations . . . in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2 (Jul. 2, 1996)).  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id.*

## II.     ALLEGATIONS

Lisa argues that the ALJ erred in two ways.  *See* Docket Item 8-1 at 1.  First, she argues that the ALJ erred under the "five-day rule" when he declined to consider the opinion of her treating nurse practitioner, Laura Marwick, FNP.  *Id.* at 16-19.  Second, she argues that the ALJ improperly evaluated the opinions of treating physicians Emmanuel A. Quaidoo, M.D., and Beatrice Deshommes, M.D.  *Id.* at 19-23.  This Court disagrees with her first argument but agrees with her second.  The Court therefore remands so that the ALJ can properly evaluate the treating physicians' opinions.

## III.    ANALYSIS

### A.     FNP Markwick's Opinion

The five-day rule sets the deadline for a claimant to submit written evidence, including statements from treating medical sources.  *See* 20 C.F.R. §§ 404.935(a), 416.1435(a).  Under the rule, the claimant must "make every effort to ensure that the [ALJ] receives all of the evidence and . . . inform [the ALJ] about or submit any written evidence . . . no later than 5 business days before the date of the scheduled hearing." *DeGraff v. Comm'r of Soc. Sec.*, 850 F. App'x 130, 131 (2d Cir. 2021) (internal quotation marks and citation omitted).  If the claimant fails to do that, the ALJ "may decline to consider or obtain the evidence."  20 C.F.R. §§ 404.935(a), 416.1435(a).  But the "ALJ must accept late evidence in a party's possession . . . if he [or she] has not issued a decision and the party's failure was because: (1) the action of the Commissioner misled the party; (2) the party had a physical, mental, educational, or linguistic limitation; or (3) there was some other unusual, unexpected, or unavoidable circumstance beyond the party's control."  *Timothy D. v. Comm'r of Soc. Sec.*, 652 F.

Supp. 3d 387, 395 (W.D.N.Y. 2023) (quoting 20 C.F.R. §§ 404.935(b), 416.1435(b))

(internal quotation marks omitted).

Lisa submitted a medical source statement from FNP Markwick on February 11,

2020, the day before the scheduled hearing date. *See* Docket Item 7 at 337. The ALJ

explained in his decision that he declined to consider FNP Markwick's opinion because

"there was no accompanying good cause statement to explain the late submission" of

the opinion. *See id.* at 20-21. Lisa argues that was error. *See* Docket Item 8-1 at 18-

19.

Lisa does not suggest that she was misled, nor does she say that a physical,

mental, educational, or linguistic limitation prevented her from submitting FNP

Markwick's opinion on time. Rather, Lisa argues that a notice of outstanding medical

records, sent by her hearing counsel to the ALJ on February 6, 2020, provided good

cause for the late submission of FNP Markwick's opinion. *See* Docket Item 8-1 at 17-

18. That February 6 notice, sent fewer than five business days before the scheduled

hearing date, states, in pertinent part, that

> [d]uring our pre-hearing conference held on 01/30/20, Ms. Gedney
> advised us that she sees her primary care provider (Laura Markwick,
> NP) on a monthly basis. We have submitted records through
> 11/19/19. We have requested records for the months of 12/2019 and
> 01/2020 and will submit those upon receipt (*if required*).

*Id.* at 331 (emphasis in original).

For several reasons, Lisa's argument fails.

First, the notice did not say anything about an unusual, unexpected, or

unavoidable circumstance beyond Lisa's control that caused Lisa to submit the

February 6 notice fewer than five business days before the hearing or that required

submitting FNP Markwick's opinion after the five-day rule deadline.  In fact, the notice

did not even mention a forthcoming opinion from FNP Marwick or offer any reason why

that opinion could not have been requested, prepared, and provided sooner.  So the

February 6 notice was insufficient to compel the ALJ to accept the late opinion.[5]

Furthermore, the February 6 notice—which itself was submitted fewer than five

business days before the hearing and therefore late—refers to a prior request for

December 2019 and January 2020 records from FNP Markwick's practice.  *See* Docket

Item 7 at 336.  But the document at issue—the document that Lisa says the ALJ should

have accepted—is dated February 10, 2020, *see id.* at 41, not December 2019 or

January 2020, and therefore was not covered by the February 6 notice.  And even more

significantly, the February 6 notice did not mention any prior requests to FNP Markwick

for a treating medical source statement, nor did it inform the ALJ of any intent to submit

opinion evidence—indeed, *any* evidence—beyond the December 2019 and January

2020 treatment records.  *See id.* at 336.

---

[5] The rules themselves offer examples of unusual, unexpected, or unavoidable circumstances beyond the claimant's control that might justify a late submission: (1) a serious illness preventing the claimant from contacting the ALJ; (2) a death or serious illness in the claimant's immediate family; (3) the accidental destruction of or damage to important records; and (4) records not received or received fewer than five business days before the scheduled hearing date despite the claimant's active and diligent efforts to obtain them sooner.  *See* 20 C.F.R. §§ 404.935(b)(3), 416.1435(b)(3).  To qualify under the fourth example—the one most relevant here—a claimant must attest that he or she actively and diligently sought a particular piece of evidence from a medical source before the five-day rule deadline.  *See, e.g.*, *Bauer v. Saul*, 2020 WL 6785490, at *4-6 (W.D.N.Y. Nov. 18, 2020) (holding as error an ALJ's refusal to accept late-submitted records after claimant's counsel provided evidence that he had requested the records on five different occasions before five-day rule deadline).  Lisa did not do that here.

The fact that Lisa's hearing counsel may not have known about Lisa's treatment with FNP Markwick until the pre-hearing conference on January 30, 2020, *see id.* at 336, was not an unusual, unexpected, or unavoidable circumstance beyond Lisa's control.  Lisa began treating with FNP Markwick in October 2018, *see id.* at 1818, and she retained her hearing counsel a month before that, *see id.* at 131-32.  Lisa's hearing before the ALJ was scheduled for February 12, 2020, and the notice for that hearing was issued on November 14, 2019.  *See id.* at 165.  So if Lisa and her attorney wanted the ALJ to consider a medical source statement from FNP Markwick, they had more than enough time to request and submit one.  Therefore, the February 6 notice did not provide good cause for Lisa's late submission of FNP Markwick's opinion.[6]

Lisa also argues that the ALJ erred under the five-day rule by accepting the December 2019 and January 2020 treatment records from FNP Markwick but rejecting FNP Markwick's treating source statement.  *See* Docket Item 8-1 at 17.  For several reasons, that argument also misses the mark.

First, as already noted, the February 6 notice referred to the treatment records that the ALJ accepted, but it did not even mention the treating source statement—a medical opinion, not a treatment record.  So the ALJ certainly acted reasonably in accepting treatment records that he knew about before the hearing and rejecting an

---

[6] To the extent Lisa argues that her hearing counsel's subsequent notice, dated February 11, 2020, provided good cause for the late submission of FNP Markwick's opinion, *see* Docket Item 8 at 18, that argument fails as well.  The February 11 notice incorrectly characterizes FNP Markwick's statement as one of the requested "outstanding medical record[s]" described in the February 6 notice.  *See* Docket Item 7 at 337.  But the February 6 notice informed the ALJ only about pre-existing treatment records from December 2019 and January 2020—not a medical opinion and not a record from February 2020.  *See id.* at 336.

opinion that he had no idea existed.  And that is especially so because the February 6 notice was itself a day late under the five-day rule, so the ALJ could have deemed even the records mentioned in that notice to have been late under the rule.

Moreover, and contrary to Lisa's contention, there is a difference between treatment records and medical source statements when it comes to the ALJ's duty to develop the record and therefore whether an ALJ might be obliged to accept their late submission.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative duty to develop the administrative record."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history," however, "the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1983) (internal quotation marks and citation omitted); *see also Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (holding that an ALJ "is not required to develop the record any further when the evidence already presented is adequate for [the ALJ] to make a determination as to disability." (internal quotation marks and citation omitted)).

The five-day rule deals with the submission of written evidence that is *required* under sections 404.1512 and 416.912, so any error on the part of the ALJ under this rule must turn on the affirmative duty set forth in those sections.  *See* 20 C.F.R. §§ 404.935, 416.1435.  Under sections 404.1512 and 416.912, the ALJ must develop the claimant's "complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [his or her] application.  *Id.* §§ 404.1512(b)(1),

416.912(b)(1).  A claimant's "complete medical history" is comprised of "the records of

[the claimant's] medical source(s) covering at least the 12 months preceding the month

in which [the claimant] file[s] [his or her] application."  *Id.* §§ 404.1512(b)(1)(ii),

416.912(b)(1)(ii).

The Second Circuit has extended the ALJ's duty beyond the twelve months

immediately preceding the date on which the claimant filed his or her application.  More

specifically, the ALJ must consider any objective treatment records generated before

the five-day rule deadline as long as the ALJ had notice of the claimant's treatment with

that provider.  *See, e.g.*, *DeGraff*, 850 F. App'x at 130-31 (ALJ erred by not considering

late-submitted objective treatment records after acknowledging that the records were

missing during the administrative hearing).  So if a claimant complies with her duty

before the five-day rule deadline to "inform [the ALJ] about or submit all evidence known

to [the claimant] that relates to whether or not [the claimant is] blind or disabled," the

ALJ is obliged to obtain and consider that evidence.  20 C.F.R. §§ 404.1512(a)(1),

416.912(a)(1).

But the ALJ's duty to develop the record is not "infinite," *Tatelman v. Colvin*, 296

F. Supp. 3d 608, 612 (W.D.N.Y. 2017), and a treating medical source statement is not

part of a claimant's "complete medical history," *see* 20 C.F.R. §§ 404.1512(b)(1)(ii),

416.912(b)(1)(ii).  In fact, an ALJ does not need a treating medical source statement to

make the disability determination.  *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29,

33-34 (2d Cir. 2013); *compare* 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (2013)

("Although [the ALJ] *will* request a medical source statement about what [the claimant]

can still do despite [his or her] impairment(s), the lack of the medical source statement

will not make the report incomplete." (emphasis added)), *with id.* §§ 404.1513, 416.913

(2017) (deleting the requirement found previously in sections 404.1513(b)(6) and

416.913(b)(6)).  So there is a difference between an ALJ's obligation to obtain and

consider treatment records and the same obligation with respect to a medical source

statement.

Here, the ALJ knew about Lisa's treatment with FNP Markwick before the five-

day deadline expired.  *See* Docket Item 7 at 331 (pre-hearing memorandum dated

January 31, 2020, stating that "Dr. Deshommes moved practices in late 2018[,] and

[Lisa] had to pursue new care with a different source (*Laura Markwick, FNP*)."

(emphasis in original)).  So the ALJ arguably was required to accept and consider the

December 2019 and January 2020 treatment records from FNP Markwick even if those

records were submitted late.

But it would erode the purpose of the five-day rule, which seeks to "appropriately

balance the twin concerns of fairness and efficiency," 81 Fed. Reg. 90987-01, 2016 WL

7242991 (Dec. 16, 2016), to conclude that an ALJ is required to accept the late

submission of a medical source statement (1) about which the ALJ had no prior notice,

(2) that was not required for the ALJ to make the disability decision, and (3) that was not

actively and diligently sought by the claimant or hearing counsel.  *See Vincent B. v.*

*Comm'r of Soc. Sec.*, 561 F. Supp. 3d 362, 369 (W.D.N.Y. 2021); *see also Yucekus v.*

*Comm'r of Soc. Sec.*, 829 F. App'x 553, 558 (2d Cir. 2020) ("Although Yucekus claims

there are additional records that should have been considered, he has not proffered

such evidence and has not explained why he could not have obtained and presented

such evidence to the ALJ.").

For all those reasons, the ALJ was not obligated to accept FNP Markwick's

medical source statement under the five-day rule, and Lisa's first argument falls short.

### B.      Dr. Quaidoo's and Dr. Deshommes's Opinions

Lisa also argues that the ALJ inadequately considered the supportability and

consistency of the opinions of her treating physicians, Dr. Quaidoo and Dr.

Deshommes.  *See* Docket Item 8-1 at 19-23.  This Court agrees.

For claims filed on or after March 27, 2017, such as Lisa's, the ALJ no longer

"defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any

medical opinion(s) or prior administrative medical finding(s), including those from [the

claimant's] medical sources." *Angela H.-M. v. Comm'r of Soc. Sec.*, 631 F. Supp. 3d 1,

7 (W.D.N.Y. 2022) (quoting 20 C.F.R. §§ 404.1520c(a), 416.920c(a)) (internal quotation

marks omitted).  Instead, the ALJ evaluates the opinion evidence and

"articulate[s] . . . how persuasive [he or] she finds the medical opinions in the case

record." *Id.* (citing 20 C.F.R. §§ 404.1520c(b), 416.920c(b)).

The Code of Federal Regulations lists five factors for the ALJ to consider when

evaluating a medical opinion: (1) the amount of evidence the source presents to support

his or her opinion; (2) the consistency between the opinion and the record; (3) the

treating provider's relationship with the claimant, including the length, frequency,

purpose, and extent of the relationship; (4) the treating provider's specialization; and (5)

any other factors that "that tend to support or contradict" the opinion.  20 C.F.R.

§§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).  The ALJ always is required to "explain how

[he or] she considered the supportability and consistency factors" because they are "the

most important factors," and "may, but [is] not required to, explain how [he or] she

considered the [remaining] factors."  *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

"Supportability" and "consistency" are terms of art defined by the regulations.

Regarding "supportability," the regulations provide that "[t]he more relevant the objective

medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion(s) or prior administrative finding(s), the more

persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.*

§§ 404.1520c(c)(1), 416.920c(c)(1); *see Spottswood v. Kijakazi*, 2024 WL 89635, at *1

(2d Cir. Jan. 9, 2024) (characterizing "supportability" as "how well supported an opinion

is by medical evidence and the explanations given in the opinion").  As to "consistency,"

the regulations provide that "[t]he more consistent a medical opinion(s) or prior

administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2); *see*

*Spottswood*, 2024 WL 89635, at *1 (characterizing "consistency" as "how consistent an

opinion is with other evidence in the record").

On October 24, 2018, Dr. Quaidoo completed a medical source statement

evaluating the functional limitations caused by Lisa's systemic lupus erythematosus

("SLE").  *See* Docket Item 7 at 1624-28.  Dr. Quaidoo opined, among other things, that

Lisa would be off task 20% of a typical workday and would likely be absent from work

"about three days per month."  *See id.* at 1628.  The ALJ found Dr. Quaidoo's opinion

partially persuasive, but he rejected the portions of the opinion that addressed Lisa's

time off task and absenteeism from work.  *See id.* at 27.  The ALJ reached that

conclusion because Dr. Quaidoo's treatment notes did "not detail any such [off-task] limitations," and the "absenteeism estimate [was] not consistent with the relative lack of [SLE] flares."  *Id.*

On November 9, 2018, Dr. Deshommes completed a similar medical source statement.  *See id.* at 1629-32.  She opined that Lisa had "significant limitations with reaching, handling[,] or fingering" but said that it was "[d]ifficult to estimate" how often Lisa could do those things "without [a] direct patient report or objective testing."  *Id.* at 1631.  Dr. Deshommes noted that despite a normal joint exam, Lisa might have difficulty using her hands, fingers, and arms "30%-50% of the time."  *Id.*  Dr. Deshommes also opined that Lisa would be off task 25% or more of a typical workday.  *Id.* at 1632.  Dr. Deshommes said that whether Lisa's health problems would cause her to miss work was a difficult question to answer, suggesting that Lisa might not miss any time if her pain were well controlled but that she might miss four or more days per month if she suffered a pain flare up.  *See id.*  The ALJ found Dr. Deshommes's opinion to be partially persuasive, rejecting the 25% off-task limitation because Dr. Deshommes's treatment notes did "not detail such limitations" and the absenteeism limitation because it was "[in]consistent with the relative lack of [SLE] flares."  *Id.* at 27-28.

The ALJ's evaluation of Dr. Quaidoo's and Dr. Deshommes's opinions failed to adequately address the supportability or consistency factors as the regulations require. As to supportability, for example, the ALJ rejected both doctors' opinions about "'off-task' limitations" because their "treatment notes . . . do not detail any such limitations." *See* Docket Item 7 at 27-28.  While that may well be true, the ALJ did not explain how

14

treatment notes might detail off-task limitations.  And it is difficult to fathom how treatment notes might do that.[7]

Even more basically, the ALJ did not even mention the remarkable consistency between two treating providers' opinions about time off task and absence from work. *Compare id*. at 1628 (Dr. Quaidoo's opining that Lisa would be off task 20% of a typical workday and would likely be absent from work "about three days per month"), *with id.* at 1632 (Dr. Deshommes' opining that Lisa would be off task 25% or more of a typical workday and that she might miss four or more days per month if she suffered a pain flare up).  Nor did he address whether or not the two doctors' consistent opinions were also consistent with the other medical records and opinions.  So the ALJ did not even pay lip service to the consistency factor.  *See Spottswood*, 2024 WL 89635, at *1.

In sum, the ALJ did not evaluate the opinion evidence as the new regulations require.   And because Lisa's pain and other symptoms might well cause her to be off task for a substantial part of any given workday—and perhaps to miss work several days each month—remand is necessary so that the ALJ either can adopt Dr. Quaidoo's and Dr. Deshommes's off-task limitations or explain why those limitations are unsupported by and inconsistent with the evidence in the record.  *See, e.g.*, *Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. Jun. 17, 2022).

---

[7] Because an off-task limitation estimates the amount of time that a claimant will be able to work while treatment notes detail medical exam findings, this Court has a hard time imagining how a treatment note might "detail" an off-task limitation.

**CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 10, is DENIED, and Lisa's motion for judgment on the pleadings, Docket Item 8, is GRANTED in part and DENIED in part.  The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.


        SO ORDERED.

Dated:        March 4, 2024
              Buffalo, New York


                                        /s/ Lawrence J. Vilardo
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE